# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THE MARCUS CORPORATION,
MARCUS INVESTMENTS, and
DIRK STALLMAN,

     Plaintiffs,

    v.                                          **Case No. 25-CV-1131-SCD**

MKD INVESTMENT HOLDINGS, LLC,

     Defendant.

## DECISION AND ORDER GRANTING PLAINTIFFS'
## MOTION TO DISMISS COUNTERCLAIMS AND GRANTING LEAVE TO AMEND

This diversity action arises from franchise agreements between Verlo Mattress and MKD Investment Holdings, a franchisee of Verlo. MKD filed an arbitration demand against Verlo, Verlo executive Dirk Stallman, Verlo's controlling member Marcus Investments, and Marcus Corporation. Stallman and the Marcus entities sued MKD in federal court seeking a declaration that they are not obligated to arbitrate with MKD. MKD moved to dismiss the complaint; the court denied that motion. In February 2026, MKD filed counterclaims against Stallman and the Marcus entities for violations of Wisconsin and Texas statutes, negligent misrepresentation, intentional misrepresentation, and civil theft. Stallman and the Marcus entities have moved to dismiss the counterclaims under Fed. R. Civ. P. 12(b)(6). Because MKD has not alleged facts that state plausible claims on which relief could be granted, I will dismiss MKD's counterclaims with prejudice except for the Wisconsin Franchise Investment Law and intentional fraud claims. MKD may file and amended pleading as to those claims, which are dismissed without prejudice.

I take these facts from MKD's counterclaims and documents referred to or relied on therein.[1] MKD is a two-member LLC in San Antonio, Texas. Countercl. ¶ 7. In 2022, MKD began exploring franchise opportunities and was introduced to Verlo, a mattress store franchisor headquartered in Milwaukee, Wisconsin. *See id.* ¶¶ 10–11. Dirk Stallman was an executive of Verlo. *Id.* ¶ 4. Marcus Investments LLC is the controlling member of Verlo. *Id.* ¶ 5. Marcus Investments' members are Gregory Marcus, David Marcus, and Andrew Marcus. *Id.* According to Verlo's Franchise Disclosure Document, David Marcus and Gregory Marcus were also directors of Verlo. Espinoza Decl. Ex. 1 at 10, ECF No. 31-1. The counterclaims do not allege Marcus Corp.'s specific legal relationship to Verlo or Marcus Investments. MKD alleges generally that counter-defendants are each "principals, owners and controlling members" of Verlo. *See* Countercl. ¶ 1. The original complaint asserts that Marcus Corporation is a publicly traded Wisconsin corporation that owns and operates real estate assets in the lodging and entertainment industries. *See id.* ¶ 21. According to the Franchise Disclosure Document, David Marcus has been president of Marcus Investments, and Gregory Marcus has been the president and CEO of Marcus Corp. Espinoza Decl. Ex. 1 at 10.

## I. Discovery Day

MKD alleges that Verlo's association with the Marcus entities influenced MKD's decision to invest in Verlo. MKD alleges that "[d]uring the recruitment process, Counter-Defendants heavily promoted Verlo as being part of the Marcus Corporation and Marcus

---

[1] Rule 12(b)(6) motion to dismiss "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

Investments with financial backing by members of the Marcus 'family.'" Countercl. ¶ 15. Specifically, MKD alleges that these statements were made:

- "Verlo's promotional materials attributed the brand's success to the Marcus Corporation and its family members, who are well-known for their vast portfolio of national hotels and resorts, restaurant chains, and movie theaters including, but not limited to KFC, Applebee's, Hilton, and Marriott." *Id.*

- "[I]n a video shown to Counterclaimants titled 'Why Invest In Verlo,' David Marcus, a principal and member of Counter-Defendants Marcus Investments and the Marcus Corporation, assured Counterclaimant that Verlo has 'a reputation to stand behind it, which is important;' before closing by stating directly to the camera: 'We are a Marcus family company.'" *Id.*

- "The Marcus Corporation and Marcus Investments, along with the Marcus family members were and are prominently featured by Verlo in numerous videos and online ads promoting the franchise." *Id.* ¶ 16.

- Marcus family members personally attended Discovery Days. *Id.*

- "Counter-Defendants, in writing and in multimedia and internet promotional materials, and via verbal communications, further represented that Verlo was financially backed by Counter-Defendants the Marcus Corporation and Marcus Investments." *Id.* ¶ 33.

In sum, MKD alleges that it "was led to believe that Counter-Defendant Marcus Corporation and/or the Marcus family financially supported Verlo and contributed their development resources and marketing expertise." *Id.* ¶ 16. MKD does not specifically allege where or when its members heard these misrepresentations, but the counterclaims support an inference that MKD members attended Verlo's "Discovery Day" and heard these statements there. MKD also alleges that counter-defendants concealed that, previously, other Verlo franchises in Texas had failed. *Id.* ¶ 14.

## II.    Franchise Disclosure Document

3

MKD alleges that Stallman and the Marcus entities made false or misleading statements in Verlo's Franchise Disclosure Document, dated May 2022. *Id.* ¶ 12. MKD alleges that the Franchise Disclosure Document understated start-up investment estimates, and overstated financial performance estimates. *See id.* ¶¶ 28, 38, 48. Specifically, MKD alleges that Item 7 of the Franchise Disclosure Document—Estimated Initial Investment—totaled $360,438 to $424,655. Espinoza Decl. Ex. 1 at 17. MKD alleges that "these estimates were severely understated." Countercl. ¶ 12. For example, while Item 7 estimated $17,400 for leasehold improvements per location, "MKD ended up spending between $250,000 to construct a basic retail store to over $900,000 to construct the factory/retail store pursuant to Verlo's specifications." *Id.* ¶ 19. MKD also asserts that the inventory costs listed in Item 7 are understated by $25,000 to $50,000 per location. *Id.*

MKD also alleges that Item 19 of the Franchise Disclosure Document—Financial Performance Representations—said that "the average franchisee earned over $1.3 million in annual net sales" for the 2021 calendar year. *See id.* ¶ 12; Espinoza Decl. Ex. 1 at 42 (Table 1). MKD alleges that, unknown to it at the time, the stores selected for this figure were located in or around Wisconsin where Verlo has history and brand recognition, and "the majority of which were owned and controlled directly or indirectly by Counter-Defendants." Countercl. ¶ 13. MKD asserts that Item 19 is misleading because "MKD was led to believe that it would be possible to make approximately $1.3 million in annual net sales. This representation was blatantly false, not representative of MKD's geographic area market, and/or made without any reasonable basis." *Id.* ¶ 20. MKD asserts that "it is practically impossible to generate anywhere close to the $1.3 million in sales reported in the FDD." *Id.*

Item 19 explains that these figures reflect seventeen franchisees who operated twenty-six stores, and none of these stores were company owned. Espinoza Decl. Ex. 1 at 41. Of this group of seventeen franchisees, ten owned only a single location. *Id.* For single-store operators, the total average annual net sales per franchisee was $1,349,698. *Id.* at 42. The per-franchise sales volume range for these single-store franchisees was between $447,646 and $2,808,141. *Id.* Item 19 also warns, in bolded font: "Some stores have sold this much. Your individual results may differ. There is no assurance that you'll sell as much." *Id.* at 41. Item 20 provides a system-wide store summary and confirms that, as reflected in the figures in Item 19, there were twenty-six franchised stores in 2021. *Id.* at 47 (Table 1) (one franchised store added during that year). Franchised stores were located in Colorado, Georgia, Illinois, Iowa, Missouri, and Wisconsin. *Id.* at 47–48 (Table 3). In 2021, Verlo itself owned five stores, all in Wisconsin. *Id.* at 48 (Table 4).

MKD and Verlo entered three franchise agreements. Countercl. Ex. 1 at 5, ECF No. 26-1 (dated July 5, 2022); Countercl. Ex. 2 at 6, ECF No. 26-2 (dated December 15, 2023); Countercl. Ex. 3 at 6, ECF No. 26-3 (dated Dec. 15, 2023). Dirk Stallman signed the franchise agreements on behalf of Verlo. *See, e.g.*, Countercl. Ex. 1 at 61. The franchise agreements included franchisee disclosure questionnaires, "the purpose" of which was "to determine whether any statements or promises were made to [the franchisee], either orally or in writing, that the Company has not authorized and that may be untrue, inaccurate or misleading." *Id.* at 61. MKD agreed that it reviewed and understood the franchise agreements and Franchise Disclosure Document. *Id.* MKD also agreed that it understood that "any prior oral or written statements not set out in the Franchise Agreement will not be binding." *Id.* Lastly, MKD agreed that no one speaking on behalf of the Company made a written or oral promise or

agreement relating to the Verlo franchise or "concerning the advertising, marketing, training, support services or assistance that the Company will furnish to you that is contrary to, or different from, the information contained in the disclosure document." *Id.* at 62.

### III. Performance

Ultimately, MKD struggled financially. *See* Countercl. ¶ 13. Despite MKD's significant marketing expenses, customers did not come, and MKD shut down its Verlo stores. *See id.* ¶ 23. MKD does not allege how long it operated its stores before closing. MKD alleges that it requested assistance from Stallman and the Marcus entities but help never came: "All of the 'Marcus' acclaim and influence that was highlighted during the recruitment process and discovery day never materialized. Neither Verlo nor the Marcus group implemented any effective strategy or plan to increase and develop brand awareness in MKD's areas prior to opening." *Id.* ¶ 22.

MKD also alleges that Stallman and the Marcus entities, by virtue of their control over Verlo, overcharged franchisees for products required to operate a Verlo franchise. Countercl. ¶¶ 24, 33.

### IV. Procedural background

On December 19, 2024, MKD filed a demand for arbitration with the AAA against Verlo, Stallman, and the Marcus entities. Compl. ¶ 27. In August 2025, Stallman and the Marcus entities filed suit in federal court arguing that they had not agreed to arbitration. *See id.* at 1, 5–6. The matter was randomly assigned to me, and all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4 & 7. MKD moved to dismiss the complaint for failure to state a claim, which I denied, and

Stallman and the Marcus entities have moved for summary judgment on the arbitrability issue. *See* ECF No. 27.

On February 23, 2026, MKD filed counterclaims against Stallman and the Marcus entities. MKD alleged six claims against all counter-defendants: (1) violation of Wisconsin Franchise Investment Law (Wis. Stat. § 553.41); (2) violation of Wisconsin Deceptive Trade Practices Act (Wis. Stat. § 100.18); (3) violation of Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code § 17.46); (4) negligent misrepresentation; (5) intentional misrepresentation; and (6) civil theft (Wis. Stats. §§ 943.20(1)(d) and 895.446). Stallman and the Marcus entities have moved to dismiss MKD's counterclaims and submitted a brief in support. ECF Nos. 32 & 33. MKD responded, and Stallman and the Marcus entities replied. ECF Nos. 41 & 43.

## MOTION TO DISMISS STANDARD

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss for failure to state a claim, the . . . complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 821 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a Rule 12(b)(6) motion, courts must "accept the well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor." *Bronson v. Ann & Robert H. Lurie Child.'s Hosp.*, 69 F.4th 437,

Case 2:25-cv-01131-SCD    Filed 06/17/26    Page 7 of 19    Document 48

448 (7th Cir. 2023) (citing *KAP Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 523 (7th Cir. 2022)).

Rule 9(b) creates a heightened pleading standard for claims alleging fraud. Rule 9(b) requires a pleading to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading 'ordinarily requires describing the who, what, when, where, and how of the fraud.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (quoting *Anchorbank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)). "While Rule 9(b) 'does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false, it does require the plaintiff to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Id.* (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)). "This specificity requirement extends only to the particulars of the allegedly misleading statement or omission itself; the other elements of fraud, such as intent, knowledge, and reliance, may be averred in general terms under the notice-pleading standard." *Schmidt v. Bassett Furniture Indus.*, No. 08-C-1035, 2009 U.S. Dist. LEXIS 103490 (E.D. Wis. Oct. 20, 2009) (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); Fed. R. Civ. P. 9(b)).

## DISCUSSION

Stallman and the Marcus entities contend that MKD has not presented a plausible claim for relief under Rule 12(b)(6), nor has it satisfied the heightened pleading standard for fraud under Rule 9(b). Generally, Stallman and the Marcus entities argue that MKD communicated with and contracted with Verlo—not Stallman or the Marcus entities. MKD

8

agreed to integration clauses in the franchise agreements that preempt most of MKD's claims by affirming that no one made representations to MKD outside of the Franchise Disclosure Document, and the franchise agreements embody the totality of the understanding between the parties. Stallman and the Marcus entities also argue that, even aside from clauses in the franchise agreements, MKD's allegedly fraudulent representations simply don't constitute misrepresentations. I will address the Rule 9(b) pleading standard first and then address whether each claim passes muster under Rule 12(b)(6).

## I.     Rule 9(b)

As a threshold matter, MKD's counterclaims lack the who, what, where, and how details that Rule 9(b) requires when a plaintiff alleges fraud or mistake. MKD's counterclaims support an inference that MKD members attended a Discovery Day and heard the alleged misrepresentations there. They also received the disclosure document, although presumably that was provided by non-party Verlo.

MKD's allegations refer to the counter-defendants collectively, without specifying which defendant made an alleged statement, or how statements made by *non*-party Verlo could be attributed to one of the counter-defendants. MKD specifically attributes one statement to David Marcus. Countercl. ¶ 15. MKD also attributes many statements to non-party Verlo. *See id.* ¶ 16 ("Verlo repeatedly boasted that the Marcus Corporation was a publicly traded company on the NYSE (MCS), which allegedly ensured that sufficient resources would be available to support the Verlo brand.").[2] Otherwise, MKD alleges misrepresentations were made by "counter-defendants" generally. *See id.* ¶¶ 1, 13, 15, 22, 33. The Seventh Circuit has

---

[2] Allegations like this suggest that much of the "fraud" MKD asserts was simply a misapprehension about the imprimatur of the Marcus Corporation. It will be difficult to show that statements about Marcus' involvement in Verlo translated to some sort of actionable guarantee or misstatement of fact.

rejected under Rule 9(b) "complaints that have lumped together multiple defendants." *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 778 (7th Cir. 1994) (internal quotation omitted). "In a case involving multiple defendants, such as the one before us, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* (internal quotation omitted). "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

MKD's counterclaims lump together multiple counter-defendants. For example, MKD alleges that "[d]uring the recruitment process, Counter-Defendants (including Dirk Stallmann, Gregory Marcus and David Marcus) made numerous false, misleading, and inaccurate statements both verbally and in writing in the Verlo FDD." Countercl. ¶ 12. That paragraph goes on to discuss the Franchise Disclosure Document and does not allege details to support an inference that statements in the Franchise Disclosure Document could be attributed to the counter-defendants, as opposed to Verlo itself. Further, neither Gregory Marcus nor David Marcus are even named as counter-defendants.

MKD's allegations of fraud lack specificity regarding the time, place, and content of the alleged misrepresentations. MKD seems to interchangeably attribute statements to Verlo and "counter-defendants" generally, without identifying the speaker. Accordingly, MKD's allegations do not satisfy Rule 9(b)'s standard for alleging fraud. *Putzier v. Ace Hardware Corp.*, 50 F. Supp. 3d 964, 972 (N.D. Ill. 2014) ("Fraud claims based on state law, including those brought under the Illinois Franchise Disclosure Act, are subject to the heightened pleading standard of Rule 9(b) when brought in federal court.")

## II. Wisconsin Franchise Investment Law

MKD's first counterclaim arises under Wisconsin's Franchise Investment Law, which creates liability for persons who make fraudulent statements during franchise sale negotiations. Wis. Stat. § 553.41. The parties dispute whether MKD's allegations fall within WFIL's scope.

The parties' primary dispute relates to the geographical scope of the statute. The WFIL applies "when a sale is made in this state *or* when an offer to sell is made *or* accepted in this state, *except that s. 553.21 does not apply* to an offer to sell that is not directed to, or received by, the offeree in this state." Wis. Stat. § 553.59(1) (emphasis added). The cross-referenced subsection, § 553.21, is the registration requirement: "No person may sell in this state any franchise unless the franchise has been registered under this chapter or is exempted under s. 553.23, 553.235 or 553.25." Wis. Stat. § 553.21. "An offer to sell is made" in Wisconsin "if the offer *either* originates in this state *or* is directed by the offeror to this state *and* received by the offeree in this state." Wis. Stat. § 553.59(2) (emphasis added).

Stallman and the Marcus entities argue that, because MKD did not receive the offer to purchase in Wisconsin, WFIL does not apply to this transaction. In *Maryland Staffing Services, Inc. v. Manpower, Inc.*, the court read this statutory scheme "to require that (1) either the offer to sell or purchase the franchise (a) originates in Wisconsin or (b) is directed to Wisconsin and (2) the offer to sell or purchase is received in Wisconsin." *Maryland Staffing Services, Inc. v. Manpower, Inc.*, 936 F. Supp. 1494, 1506 (E.D. Wis. 1996) (holding that the franchisee did not receive the offer in Wisconsin, so WFIL did not apply).

MKD disagrees, arguing that the statute should be read disjunctively, so an offer falls within the scope of WFIL if it originated in Wisconsin. "Reviewing the plain meaning of the

11

statute, there are two ways that an offer to sell can be made: (1) an offer originates in Wisconsin; or (2) an offer is directed by the offeror to Wisconsin and the offer is received by the offeree in Wisconsin. Wis. Stat. § 553.59(2). The statute applies when either of the following occurs: (1) a sale or an offer to sell occurs in Wisconsin; or (2) an offer to purchase is made and accepted in Wisconsin." *Cousins Subs Systems, Inc. v. Better Subs Dev., Inc.*, Case No. 09-C-0336, 2011 WL 4585541, 2011 U.S. Dist. LEXIS 112903, at *30 (E.D. Wis. Sept. 30, 2011). Stallman and the Marcus entities counter that *Cousins Subs* did not analyze how Wis. Admin. Code DFI § 32.05(1)(d) or Wis. Stat. § 553.21 impact the analysis.

I conclude that the *Cousins Subs* interpretation gives meaning to every word in Wis. Stat. § 553.59(1) and harmonizes subsections (1) and (2). Wis. Stat. § 553.59(1) says that WFIL applies "when a sale is made in this state or when an offer to sell is made or accepted in this state, *except that s. 553.21 does not apply to an offer to sell that is not directed to, or received by, the offeree in this state.*" Wis. Stat. § 553.59(1) (emphasis added). Giving meaning to the "exception" requires interpreting the scope of WFIL to generally *include* offers to sell that are neither directed to nor received by an offeree in Wisconsin. Under Stallman and the Marcus entities' interpretation, the exception clause would be rendered superfluous. I thus conclude that the WFIL applies. Thus, although the claim will be dismissed without prejudice under Rule 9(b), it will not be dismissed on its merits.[3]

---

[3] This cause of action carries a three-year statute of limitations that begins to run when the franchise agreement is signed. Wis. Stat. § 553.51(4). "[C]ourts have uniformly held that the statute of limitations for purposes of the WFIL begins to run on the day the parties execute the alleged franchise agreement." *Rajaraman v. GEICO Indem. Co.*, No. 23-CV-425-JPS, 2023 WL 8367752, 2023 U.S. Dist. LEXIS 199081, at *21 (E.D. Wis. Oct. 31, 2023). "The reason the statute of limitations begins to run on that date is because the two forms of civil liability under the WFIL both deal with conduct that a franchisee would necessarily know at the time the agreement is signed." *Id.* Neither party raised the potential statute of limitations issue here—the first franchise agreement was signed in July 2022, and these counterclaims were

## III. Wisconsin Deceptive Trade Practices Act

The Wisconsin Deceptive Trade Practices Act prohibits fraudulent representations in advertising. Wis. Stat. § 100.18. To assert a claim under the DTPA, MKD must "allege three elements: '(1) the defendant made a representation to the public with the intent to induce an obligation, (2) that the representation was untrue, deceptive or misleading, and (3) that the representation caused the plaintiff a pecuniary loss.'" *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrig'g & Air-Condit'g Eng'rs., Inc.*, 755 F.3d 832, 837 (7th Cir. 2014) (quoting *Novell v. Migliaccio*, 309 Wis. 2d 132, 749 N.W.2d 544, 552 (Wis. 2008)). Stallman and the Marcus entities argue principally that MKD did not allege representations "made to the public," nor were the alleged representations untrue, deceptive, or misleading.

MKD does not attribute any of the purported representations to Stallman. Even assuming that the Marcus family members' statements made at Discovery Day and in promotional material could be attributed to the Marcus entities, instead of Verlo, those statements were not made to the public. "The public" does not require a large audience; "a statement made to one person may constitute a statement made to 'the public[.]'" *Kailin v. Armstrong*, 252 Wis. 2d 676, 643 N.W.2d 132, 149 (Wis. Ct. App. 2002). "However, the important factor in defining 'the public' is 'whether there is some particular relationship between the parties.'" *Id.* (quoting *State v. Automatic Merchs. of Am., Inc.*, 64 Wis. 2d 659, 664, 221 N.W.2d 683 (1974)).

Relying on *Kailin*, quoted above, *Cousins Subs* rejected a DTPA claim at summary judgment predicated on statements made at a discovery day: "Even if defendants were to

---

filed in February 2026.

13

point to Discovery Day as evidence of advertisement to the public, there are insufficient facts to demonstrate that this was open to the public rather than a particular class of people who had previously shown interest in opening a Cousins franchise." *Cousins Subs Sys., Inc.*, 2011 U.S. Dist. LEXIS 112903, at *29. Here, MKD has not alleged that Discovery Day was open to the public rather than a category of people who had a particular relationship to Verlo. MKD responds that promotional videos were publicly available online; however, first, MKD did not allege this fact in the counterclaims, and second, just because a video is *made accessible* to the public does not mean a statement in the video is *made to* the public.

MKD has not alleged that Stallman or the Marcus entities made verbal misrepresentations "to the public." MKD's claim under the Wisconsin Deceptive Trade Practices Act must be dismissed for failure to state a claim on which relief could be granted.

## IV. Texas Deceptive Trade Practices Act

The Texas Deceptive Trade Practices Act prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46. The TDTPA exempts claims "arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence." Tex. Bus. & Com. Code § 17.49(g). Stallman and the Marcus entities argue that this exemption bars MKD's claim based on the allegations on the face of the counterclaims. MKD argues that the amount in consideration for each franchise agreement should not be aggregated, and that this exemption is an affirmative defense that shouldn't be considered at this stage.

"Courts that have sought to interpret [the terms "project" or "total consideration"] and apply § 17.49(g) have done so considering the purpose of § 17.49(g), which is to 'maintain the

DTPA as a viable source of relief for consumers in small transactions and to remove litigation over large transactions between businesses from the scope of the DTPA.'" *McCoy v. Valvoline, LLC*, 568 F. Supp. 3d 666, 676 (N.D. Tex. 2021) (quoting *Mullins Square, Inc. v. Source 2 Mkt., LLC*, Case No. A-08-CA-777-SS, 2009 WL 10669887, 2009 U.S. Dist. LEXIS 155154, at *3 (W.D. Tex. Dec. 14, 2009)). Courts look to the nature of the relationship to determine whether a set of transactions relates to the same project, "properly defined as a planned undertaking." *Id.* (citation modified).

Here, the nature of the relationship is between the franchisor's leadership and a franchisee. MKD and Verlo's franchise agreements related to the same project, or planned undertaking, of MKD's opening multiple Verlo stores in Texas. MKD's counterclaims do not distinguish between individual stores or franchise agreements and references the stores collectively. *See* Countercl. ¶ 18 (MKD signed a franchise agreement to open seven stores in San Antonio area, and paid $240,000 in franchise fees), ¶ 19 (MKD spent between $250,000 and $900,000 to construct stores), ¶ 23 (MKD invested over $2 million "in the business" and counterclaims aggregate lease, insurance, and marketing expenses between stores).

Affirmative defenses can be considered at the motion to dismiss stage if the relevant facts are contained within the complaint. *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006). Based on the allegations in MKD's counterclaims, MKD's claims arise from a set of transaction relating to the same project—opening Verlo stores in the San Antonio area—involving total consideration of more than $500,000. Accordingly, MKD's claim is barred by Section 17.49(g), and MKD cannot plausibly re-plead facts that would revive this claim.

## V. Negligent and Intentional Misrepresentation

MKD also brings common law claims for negligent and intentional misrepresentation.

In Wisconsin, "[a]ll misrepresentation claims share the following required elements: 1) the defendant must have made a representation of fact to the plaintiff; 2) the representation of fact must be false; and 3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage." *Tietsworth*, 677 N.W.2d at 245. "Statements of fact must relate to a present issue of fact, not something to occur in the future." *Cousins Subs Sys., Inc.*, 2011 U.S. Dist. LEXIS 112903, at *18 (citing *Hartwig v. Bitter*, 139 N.W.2d 644 (1966)). "Additionally, no-reliance clauses are enforceable, and integration clauses work to exclude oral communications from the written contract." *Id.* (citation modified).

The franchise agreements contained integration clauses disavowing any prior oral or written statements not set out in the franchise agreements. The franchise agreements also affirmed that no one had made any written or oral promises concerning assistance from Verlo that was contrary to the information contained in the Franchise Disclosure Document. MKD's negligent fraud claims "cannot be maintained against the no-reliance and integration clauses of the contracts. Intent is irrelevant to this analysis and the clear contractual clauses bar defendants from relying on any information not contained in the contract. As a matter of law, no-reliance clauses are enforceable, and defendants signed such a clause." *Id.* MKD's negligent misrepresentation claim must therefore be dismissed with prejudice.

For intentional fraud, "in addition to the fraud elements above, Wisconsin adds the following: (4) the representations must have made with the knowledge that it was false or recklessly without caring whether it was true or false; and (5) the representation must have made with the intent to deceive and to induce defendants to act on it to their detriment or damage." *Id.* at *20. (citing *Tietsworth*, 677 N.W.2d at 239). "Most importantly, though, exculpatory clauses are not enforceable when the fraud is carried out intentionally or

recklessly." *Id.* Although I have concluded that the counterclaims do not satisfy Rule 9(b), it is conceivable that claim 5 could be plead with sufficient particularity to state a valid claim. Accordingly, I will dismiss the intentional fraud claim without prejudice.

## VI. Civil theft

Lastly, MKD brings a claim for civil theft against Stallman and the Marcus entities. In Wisconsin, "[a]ny person who suffers damage or loss by reason of intentional conduct . . . that is prohibited under . . . 943.20 . . . has a cause of action against the person who caused the damage or loss." Wis. Stat. § 895.446(1). "Section 943.20 defines five modes of committing theft." *State v. Lopez*, 2019 WI 101, ¶ 17, 936 N.W.2d 125, 129. Here, MKD asserts a claim of civil theft under the fourth mode: theft of money by fraud.

Subsection (d) prohibits "[o]btain[ing] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. 'False representation' includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme." Wis. Stat. § 943.20(1)(d). "Under Wisconsin law, . . . civil theft require[s] the victim to have an ownership interest in the property converted or stolen." *Milwaukee Ctr. for Indep., Inc. v. Milwaukee Health Care, LLC*, 929 F.3d 489, 494 (7th Cir. 2019) (citing § 895.446(1); § 943.20(1)(b); *H.A. Friend & Co. v. Pro. Stationery, Inc.*, 2006 WI App 141, ¶ 11, 720 N.W.2d 96, 100). "If you simply owe someone money and fail to pay it, you have broken a contract but you have not taken your creditor's property." *Kentuckiana Healthcare, Inc. v. Fourth St. Sols., LLC*, 517 F.3d 446, 447 (7th Cir. 2008).

Here, MKD argues that the counterclaim plausibly alleges that *Verlo* and its affiliates intentionally obtained counter-claimants' money through false representations and with the

intent to permanently deprive them of that property. But Verlo isn't a party here. Further, MKD has not alleged that Verlo or the counter-defendants have any kind of ownership interest in the property (MKD's money) allegedly stolen. Accordingly, MKD's civil theft count will be dismissed with prejudice.

## VII. Amendment

MKD requested leave to amend, emphasizing the Seventh Circuit's liberal amendment policy. Stallman and the Marcus entities respond that dismissal should be with prejudice because amendment would be futile, and MKD has not submitted a proposed amended complaint in any event. As indicated above, some of the claims will indeed be dismissed with prejudice. As to the fraud allegations, it is possible that the counter-defendants will be proven correct, as my review of the claims does not reveal any obvious actionable statements or omissions. Nevertheless, the parties have not meaningfully briefed the merits of the allegations, and so I conclude that dismissal with prejudice would be premature. Accordingly, I will grant leave to amend. "Ordinarily where a complaint is dismissed on Rule 9(b) 'failure to plead with particularity' grounds alone, leave to amend is granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1435 (3d Cir. 1997).

**CONCLUSION**

For the foregoing reasons, Stallman and the Marcus entities' motion to dismiss, ECF No. 32, is **GRANTED in part**. MKD's counterclaims, ECF No. 26, are **DISMISSED**: counts one and five are **dismissed without prejudice**. The other claims are **dismissed with prejudice**. MKD may have until July 10 to file an amended pleading in accordance with Fed. R. Civ. P. 9(b), Fed. R. Civ. P. 15, and E.D. Wis. L.R. 15.

18

**SO ORDERED** this 17th day of June, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge