# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**THE MARCUS CORPORATION,**
**MARCUS INVESTMENTS, LLC,** and
**DIRK STALLMAN,**

    **Plaintiffs,**

    **v.**

**MKD INVESTMENT HOLDINGS, LLC,**

    **Defendant.**

**Case No. 25-CV-1131-SCD**

---

## DECISION AND ORDER

---

This case asks whether non-signatories to an arbitration agreement may be compelled to arbitrate a dispute. Specifically, franchisee MKD Investment Holdings seeks to compel persons associated with non-party franchisor Verlo Mattress to arbitrate. Dirk Stallman is a former Verlo executive. Marcus Investments owns Verlo. Marcus Corporation's directors overlap with Verlo's and Marcus Investments' directors. MKD sought arbitration with Verlo, Stallman, Marcus Investments, and Marcus Corp. In response, Stallman, Marcus Investments, and Marcus Corp. brought this lawsuit to challenge whether they could be compelled to arbitrate with MKD.

In August 2025, Stallman, Marcus Investments, and Marcus Corp. sued MKD in federal court seeking a declaration that, as non-signatories to the arbitration agreement between Verlo and MKD, they do not need to arbitrate with MKD. ECF No. 1. MKD moved to dismiss, arguing that an arbitrator could, and already did, decide the question of arbitrability. *See* ECF Nos. 14 & 15. In January 2026, I denied MKD's motion to dismiss. ECF

No. 22. Shortly after, MKD filed counterclaims against Stallman, Marcus Investments, and Marcus Corp., which were dismissed. ECF Nos. 26, 32, 33, 48.

On March 6, 2026, Stallman, Marcus Investments, and Marcus Corp. moved for summary judgment on their declaratory claim. ECF No. 27. Plaintiffs filed a brief in support of their motion, proposed findings of fact, exhibits, and stipulated facts. ECF Nos. 28–30. MKD filed a brief in opposition to the motion for summary judgment, a response to the plaintiffs' proposed facts, its own proposed facts, and exhibits. ECF Nos. 35–38. Stallman, Marcus Investments, and Marcus Corp. filed a reply brief in support of their motion to dismiss, and a response to MKD's proposed facts. ECF Nos. 44 & 45. Separately, MKD moved under Rule 56(d) to continue summary judgment briefing pending more discovery and submitted a declaration in support. ECF Nos. 39 & 40. Stallman, Marcus Investments, and Marcus Corp. filed a brief in opposition to MKD's motion for a continuance, ECF No. 46, and MKD replied, ECF No. 47.

I will first consider MKD's motion to continue summary judgment. Then, I will consider Stallman, Marcus Investments, and Marcus Corp.'s motion for summary judgment.

## LEGAL STANDARD

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). The court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Heft v.*

2

*Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Under Rule 56(d), upon a nonmovant's showing that the nonmovant cannot present facts essential to justify its opposition to summary judgment, the court can delay considering the summary judgment motion, deny the motion, or allow time for additional discovery. Fed. R. Civ. P. 56(d). "The Rule places the burden on the non-movant that believes additional discovery is required to 'state the reasons why the party cannot adequately respond to the summary judgment motion without further discovery.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014) (quoting *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006)). "A party seeking relief under Rule 56(d) must show by affidavit or declaration specific reasons discovery should be extended, which requires more than a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019).

**MKD'S RULE 56(d) MOTION FOR CONTINUANCE**

MKD moved to continue summary judgment under Rule 56(d) pending additional discovery. ECF No. 39. MKD argues that the court should grant MKD an opportunity for discovery prior to deciding summary judgment because MKD's defenses are fact-intensive inquiries. *See id.* at 2–3. Specifically, MKD seeks discovery into these categories:

- "[T]he relationship between Plaintiffs and [Verlo] including, for example, corporate governance documents, communications regarding the Franchise Agreements, Plaintiffs' involvement in negotiating, approving, or directing franchise operations." ECF No. 40, ¶ 12.

- "[C]ommunications and documents reflecting Plaintiffs' role in marketing or promoting the Verlo franchise system, communications with MKD regarding the franchise opportunity, [and] representations made to induce MKD to enter the Franchise Agreements." *Id.* ¶ 13.

3

- "Plaintiffs' direct benefits and financial interests as it relates to Verlo, such as documents and testimony concerning any economic or strategic benefits Plaintiffs received or expected to receive from the Franchise Agreements. More specifically, discovery is needed to obtain evidence regarding financial flows between Plaintiffs and Verlo, compensation structures, bonuses, or incentives tied to franchise performance, and internal analyses or projections concerning MKD's franchise locations." *Id.* ¶ 14.

- "[D]ocuments and testimony concerning the relationship between Plaintiffs and Verlo, including the overlapping roles and responsibilities of shared officers, directors, or decision-making authority, financial interdependence, operational control over franchise-related activities." *Id.* ¶ 15.

In response, Plaintiffs argue, first, that MKD's failure to raise its need for discovery earlier resulted in waiver. ECF No. 46 at 9–12. Second, discovery would be futile because it would not change the outcome of summary judgment. *Id.* at 12–14. Third, MKD's proposed categories of discovery are not particularized: "[t]hese are the conclusions MKD hopes to reach, not facts it has reason to believe exist." *Id.* at 21.

Courts routinely grant motions under Rule 56(d), except in cases of futility or lack of diligence. *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 865, 868 (7th Cir. 2019). A Rule 56(d) motion may be denied based on "(1) the moving party's failure to pursue discovery diligently before the summary judgment motion, or (2) the apparent futility of the requested discovery." *Id.* at 866. While meaningful discovery prior to summary judgment is important, "[t]he mere fact that discovery is incomplete is not enough to prevent summary judgment." *Id.* at 864 (citing *Farmer v. Brennan*, 81 F.3d 1444, 1450 (7th Cir. 1996)).

Below is a chart of MKD's representations alongside key dates in this litigation.

| Date | MKD's action |
|---|---|
| Dec. 19, 2024 | MKD filed a demand for arbitration against plaintiffs. Compl. ¶ 27, ECF No. 1. |
| Aug. 1, 2025 | Plaintiffs filed this lawsuit in federal court. Compl., ECF No. 1 |
| Oct. 20, 2025 | From the Joint Rule 26(f) Report: "Plaintiffs anticipate filing an early motion for summary judgment and seeking a speedy hearing on the issues in this matter, pursuant to Fed. R. Civ. P. 56." ECF No. 11 at 3. |
| Jan. 26, 2026 | Decision and order denying MKD's motion to dismiss complaint. Order, ECF No. 22. |
| Feb. 11, 2026 | From the Revised Joint Rule 26(f) Report: "Plaintiffs anticipate filing an early motion for summary judgment and seeking a speedy hearing on the issue regarding whether Plaintiffs are obligated to defend as respondents in the Arbitration, when none of Plaintiffs have agreed to arbitrate with Defendant, pursuant to Fed. R. Civ. P. 57." ECF No. 24 at 3. "Whether and to what extent discovery should be conducted in this matter will depend on whether the Court determines that Plaintiffs are obligated to arbitrate with Defendant and the nature of Defendant's counterclaims against Plaintiffs. To conserve judicial and party resources, the Parties respectfully request that the Court set a time to submit a supplemental joint discovery plan upon the filing of Defendant's counterclaims and/or resolution of the Parties' anticipated motions, if necessary." *Id.* |
| Feb. 18, 2026 | Court sets briefing schedule for counterclaims and motion for summary judgment. Scheduling Order, ECF No. 25. |

On three occasions, MKD acknowledged that plaintiffs would file an early motion for summary judgment. MKD did not raise its apparent need for discovery on those occasions.

This series of events is very similar to *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869 (7th Cir. 2021). In that case, plaintiffs were debt collectors for Medicare advantage organizations who used the litigation process to learn the value of their assignments prior to pursuing collection. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 873 (7th Cir. 2021). At the outset, to demonstrate an injury-in-fact required for standing, the plaintiffs identified an illustrative beneficiary. *Id.* At summary judgment, the facts revealed that the illustrative beneficiary actually did not have an injury-in-fact, and the district court granted summary judgment to defendants for lack of standing. *Id.* at 873–74. The plaintiffs moved for additional discovery under Rule 56(d) to obtain

5

information about other potential illustrative beneficiaries—even though plaintiffs had not objected to the scheduling order nor raised this discovery dispute previously, and even though plaintiffs had known about those potential illustrative beneficiaries before litigation even started. *See id.* at 877.

The district court rejected the Rule 56(d) motion based on plaintiffs' lack of diligence, and the Seventh Circuit affirmed. The plaintiffs "never objected to the magistrate judge's discovery order. They cannot now use their appeal of a Rule 56(d) motion to challenge a scheduling order they never objected to in the first instance." *Id.* ("[B]ecause [Plaintiff] failed to object to the magistrate judge's order prior to, during or after the hearing, the issue has been waived." (quoting *Pinkston v. Madry*, 440 F.3d 879, 891 n.15 (7th Cir. 2006))). Further, the plaintiffs "had ample time to conduct non-party discovery to develop the evidence related to these claims but took no steps to do so." *Id.* The Seventh Circuit warned: "Federal courts do not possess infinite patience, nor are the discovery tools of litigation meant to substitute for some modicum of pre-suit diligence." *Id.* at 878.

So too here. In two Joint 26(f) Reports, MKD acknowledged that plaintiffs would file an early motion for summary judgment. MKD had another opportunity to raise its need for discovery during the conference setting the schedule for summary judgment briefing. MKD did not object there, either. As in *MAO-MSO*, MKD cannot use a Rule 56(d) motion to challenge a schedule that it didn't object to in the first instance. MKD argues that it could not have anticipated that plaintiffs' motion for summary judgment would rely on such fact-intensive inquiries regarding agency, equitable estoppel, and alter ego. ECF No. 39 at 1. It's not clear what else MKD could have anticipated a motion for summary judgment would

6

involve, considering MKD has been attempting to compel these non-signatories into arbitration based on these theories since December 2024.

MKD also replies that this situation is distinguishable from *MAO-MSO* because there, the plaintiffs had known about the circumstances years before the defendant filed its summary judgment motion but hadn't developed the evidence. Here, MKD argues, MKD has been diligent because this case is scarcely eight months old. *See* ECF No. 47 at 3. MKD is wrong. First, as in *MAO-MSO*, the universe of potentially relevant facts and legal theories were known to MKD years ago because MKD pursued arbitration in December 2024. For example, one of MKD's exhibits was saved on May 30, 2025—before the federal complaint was filed. *See* ECF No. 36-8. Second, MKD seems to argue that this case is distinguishable because MAO-MSO already had access to the information it wanted about other potential illustrative beneficiaries. That is not correct; what MAO-MSO sought "was both simple and vast: for Defendant to produce demographic evidence of everyone in its claims database who is Medicare eligible and to then provide that information to a third-party data vendor (selected by the parties) who will create a report of names that exist in that list and in Plaintiffs' list of MAO members." *MAO-MSO Recovery II, LLC et al. v. State Farm Mut. Auto. Ins.*, Case No. 17cv1537, Dkt. 204 at 6 (C.D. Ill. Sept. 17, 2019). The issue there—as here—was that MAO-MSO had been on notice from before the outset of litigation.

Third, taking a step back, non-signatories are generally not bound to arbitration agreements, and courts will only "enforce an arbitration agreement against a non-signatory if the party seeking to compel arbitration can show that an exception to this general rule applies." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018) (citing *Zurich Am. Ins. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)). MKD's request for discovery at this

7

point sounds in "mere speculation," which Rule 56(d) does not permit. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 766 (7th Cir. 2015) (quoting *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 885 (7th Cir. 2005)). If MKD has no evidence to overcome basic principles of contract and agency law, then the time to raise that concern was *before* attempting to compel non-signatories into arbitration—not after.

Accordingly, MKD's motion to continue summary judgment briefing to pursue more discovery will be denied. Three times, MKD acknowledged that plaintiffs would be filing an early summary judgment motion, and three times MKD failed to object. MKD's motion to continue summary judgment is denied.

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST MKD

I take these facts from the parties' statement of stipulated material facts. Stip. Facts, ECF No. 29. The parties also filed their own proposed statements of material facts. Pls.' Facts, ECF No. 30; Def.'s Facts, ECF No. 37. The plaintiffs disputed many of MKD's proposed facts but asserted that these disputed facts are not material for summary judgment. Pls.' Resp. to Def's Facts, ECF No. 45. The plaintiffs did not cite to the materials in the record for these disputes as required by Rule 56(c)(1); instead, they cited to legal argument in their brief. *See generally id.* Accordingly, MKD's proposed facts were uncontroverted and will be deemed admitted for the purpose of deciding summary judgment. Fed. R. Civ. P. 56(e)(2); E.D. Wis. Civ. L.R. 56(b)(4).[1] For its part, many of MKD's responses include legal argument about the franchise agreements' enforceability and impact of shared officers between entities, *see, e.g.*, Def.'s Resp. to Pls.' Facts, ECF No. 45. ¶¶ 3, 10, or assertions that MKD does not have

---

[1] *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.").

sufficient information to dispute the proposed fact, and therefore requests additional discovery under Rule 56(d), *see, e.g.*, *id.* ¶¶ 6, 7. To the extent the plaintiffs' proposed material facts were properly disputed by MKD, those disputes will be noted parenthetically. *See* Def.'s Resp. to Pls.' Facts, ECF No. 45.

MKD entered three franchise agreements with Verlo, a franchisor. Stip. Facts ¶¶ 1–2. The franchise agreements contained arbitration provisions. *Id.* ¶ 3. Neither Marcus Investments nor Marcus Corp. signed a franchise agreement or arbitration agreement with MKD. *Id.* ¶¶ 4–7. The franchise agreements provided that Verlo's officers, directors, employees, and agents act only in their representative capacity and that the franchise agreements do not confer rights to non-signatories. Def.'s Resp. to Pls.' Facts ¶¶ 2–3. Section 2.E. of the franchise agreements provides: "In all of their dealings with Franchisee, the officers, directors, employees, and agents of the Company act only in a representative capacity, not in an individual capacity, and that this Agreement and all business dealings between Franchisee and such individuals as a result of this Agreement are solely between Franchisee and the Company." ECF No. 29-1 at 6. Section 19.J. of the franchise agreements provides: "[N]othing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto." *Id.* at 50.

Marcus Investments owns Verlo. *See* Pls.' Resp. to Def.'s Facts ¶ 1 (Plaintiffs dispute this proposed fact without citing evidence and maintain that this fact is not material). Greg Marcus and David Marcus have been directors of Verlo since 2011. Stip. Facts ¶¶ 15–16. David Marcus has been President of Marcus Investments since April 2006. *Id.* ¶ 21. Marcus Corp. is the "primary investment vehicle" for the Marcus family. *See* Pls.' Resp. to Def.'s Facts ¶ 2. Greg Marcus has held different positions at Marcus Corp. since January 1999. Stip. Facts

9

¶ 20. In 2022, Greg Marcus was President and CEO of Marcus Corp. *Id.* Stephen Marcus is also a director of Verlo and has been Chairman of Marcus Corp. since 1962. *Id.* Marcus Corp. does not have any ownership interest in Verlo. Def.'s Resp. to Pls.' Facts ¶¶ 12 (disputed by MKD based on overlapping shareholders between Marcus Corp. and Verlo, and lack of discovery on this issue). Verlo, Marcus Corp., and Marcus Investments maintain separate financial statements and are separate legal entities. *See* Def.'s Resp. to Pls.' Facts ¶ 16 (disputed by MKD based on Marcus Investments' and Marcus Corp.'s direct or indirect financial interest in Verlo, and lack of discovery on this issue).

Stallman, the then-President of Verlo, signed the franchise agreements. Def.'s Resp. to Pls.' Facts ¶ 1; ECF No. 26-1 at 68. The parties agree that Stallman has not signed a franchise agreement or arbitration agreement with MKD in Stallman's individual capacity. Stip. Facts ¶¶ 8–9, 12. It is undisputed that Stallman has not sought to personally enforce or claim a right under a franchise agreement. Def.'s Resp. to Pls.' Facts ¶¶ 4–5. However, MKD disputes the legal conclusion that Stallman cannot be liable to MKD in his individual capacity. *See* Def.'s Resp. to Pls.' Facts ¶ 1. Stallman does not have an ownership interest in Verlo and did not receive a bonus or commission when MKD entered the franchise agreements. *See* Def.'s Resp. to Pls.' Facts ¶¶ 6–7. MKD responds that it does not have sufficient information to respond to these proposed facts and needs additional discovery on these items.

Like Stallman, it is undisputed that neither Marcus Corp. nor Marcus Investments signed any franchise agreement or arbitration agreement with MKD. Stip. Facts ¶¶ 4–7. Marcus Corp. and Marcus Investments have not filed legal claims against MKD related to the franchise agreements. *Id.* ¶¶ 14–15. However, MKD disputes that Marcus Investments and Marcus Corp. have not sought to enforce the franchise agreements. Def.'s Resp. to Pls.' Facts

10

¶¶ 7–8. MKD argues that "overlapping officers and/or directors" establish the Marcus entities' substantial control over Verlo, therefore the Marcus entities have indirectly sought to enforce the franchise agreements or arbitration agreements. *See* Def.'s Resp. to Pls.' Facts ¶¶ 8–11. On the same basis, MKD disputes that the Marcus entities did not receive payments or direct benefits when MKD entered the franchise agreements. MKD requested further discovery related to these items. *See id.*

MKD details Stallman's, Greg Marcus's, David Marcus's, and the Marcus entities' interactions with Verlo. During the recruitment process, Stallman made statements about the finances of opening a Verlo factory and show room. Pls.' Resp. to Def.'s Facts ¶ 6. Stallman stated that Verlo was "financially backed by the Marcus family and their businesses, who were known locally for their experience in building brands and businesses." *Id.* ¶ 7. In June 2022, MKD's members attended Verlo's "Discovery Day," an event in Wisconsin for prospective franchisees. *Id.* ¶ 8. Stallman made these statements:

- "The Marcus Corporation and Marcus Investments were part of the Marcus family of companies that specialized in building businesses." *Id.* ¶ 12.

- Marcus Investments had purchased Verlo "and planned to act as the primary investor." *Id.* ¶ 15.

- Marcuses' "'money and experience behind franchising' represented the commitment to growing the Verlo brand from coast to coast." *Id.* ¶ 17.

- Marcus Corp., a NYSE company, "back[ed]" Verlo. *Id.* ¶ 18.

- Verlo had a big marketing plan in place. *Id.* ¶ 21.

- Legacy franchises underperformed because "they didn't understand marketing like Greg and David Marcus." *Id.* ¶ 22.

- "[T]he Marcus family had a roadmap to improve success with their financial resources and marketing expertise." *Id.* ¶ 23.

11

Verlo's presentation material featured information about the "Marcus Family," their franchise experience, Marcus Corp., and Marcus Investments. *Id.* ¶¶ 26, 27–30. Greg and David Marcus, also present at Discovery Day, introduced themselves as executives of Marcus Corp. and members of the board of directors at Marcus Investments. *Id.* ¶¶ 13–14. At Discovery Day, prospective franchisees watched "at least one video . . . featuring Greg and/or David Marcus" discussing their franchise experience. *Id.* ¶ 19.

MKD received promotional signs stating: "Today, Verlo mattress is owned by Marcus Investments, [a] Marcus Family company based in Milwaukee, WI. The Marcus Family is also a controlling stakeholder in The Marcus Corporations (NYSE, MCS) which has a portfolio of upscale hotels and resorts nationwide. As world-class hoteliers, the Marcus Family is proud to provide impeccable service and quality." *See id.* ¶ 32. Verlo's website stated that: "Marcus Investments and "the Marcus Family" have an ownership interest in Verlo Mattress, which in turn is a 'controlling stakeholder in The Marcus Corporation.'" *Id.* ¶ 33 (plaintiffs dispute as not reflecting the current website). In publicly available YouTube videos, Verlo "promotes David Marcus and the Marcus family's expertise in building businesses." *Id.* ¶ 38.

Marcus Investments' website makes these statements:

- "2011 – Marcus Investments purchased Verlo Mattress." *Id.* ¶ 34 (plaintiffs dispute as not reflecting the current website).

- "The Marcus Corporation serves as the primary investment vehicle for the Marcus family. Since its inception, it was led by Ben, then Steve his son, and now Greg Marcus, Ben's grandson. Today, Marcus Investments, led by Ben's other grandson David Marcus, offers new opportunities for the family and its partners to invest in and build businesses, all with the same operational savvy and quiet persistence that has been the Family's hallmark." *Id.* ¶ 35.

On March 10, 2025—after MKD had filed its arbitration demand—David Marcus sent an email to Verlo franchisees from a Marcus Investments email address. *Id.* ¶ 37; Ex. 9 to Domgard Decl.

**DISCUSSION**

MKD proposes that plaintiffs could be compelled to arbitrate under the agency, direct benefits estoppel, or alter ego theories. I will consider each theory as applied to Stallman, Marcus Investments, and Marcus Corp.

## I. Compelling a non-signatory to arbitrate

"Under the Federal Arbitration Act, arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co.*, 417 F.3d at 687 (citing 9 U.S.C. § 4 and *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909–10 (7th Cir.1999)). Ordinarily, a non-signatory cannot enforce an arbitration agreement. However, a "nonparty may invoke an arbitration clause if the ordinary principles of state contract law permit it to do so." *Scheurer v. Fromm Fam. Foods LLC*, 202 F. Supp. 3d 1040, 1045 (W.D. Wis. 2016), aff'd, 863 F.3d 748 (7th Cir. 2017). The Supreme Court has "identified assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary, waiver, and estoppel among those state law principles that could govern who may enforce the [arbitration] agreement." *Scheurer*, 863 F.3d at 753 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). The Seventh Circuit has also included agency and assumption in that list. *Id.* (citing *Zurich*, 417 F.3d at 687).

### A. Agency

13

Under Wisconsin law, two parties create an agency relationship when three elements are met: "(1) the manifestation of the principal that the agent is to act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to control the undertaking. WIS JI–CIVIL 4000. Mere authority to act for another does not, without more, establish agency since independent contractors, as well as agents, both act on behalf of a principal." *Norton v. Am. Home Mortg. Servicing, Inc.*, Case No. 11-C-842, 2011 WL 5828122, at \*2 (E.D. Wis. Nov. 18, 2011) (citing *Envirologix Corp. v. City of Waukesha,* 531 N.W.2d 357, 365 (Wis. Ct. App. 1995)).

Applied in the arbitration agreement context, an agent who signs a contract on behalf of a disclosed principal does not personally bind himself to the contract. *See Theuerkauf v. Sutton*, 306 N.W.2d 651, 659 (Wis. 1981). "The agent is only liable where there is clear and explicit evidence of an intention to substitute or superadd his liability." *Id.* (internal quotation omitted). An agent who signs a contract on behalf of an undisclosed or unidentified principal does personally bind himself to the contract. Restatement (Third) of Agency §§ 6.02 and 6.03 (2006). Accordingly, an agent signing an arbitration agreement on behalf of an undisclosed or unidentified principal may be bound to the arbitration agreement. *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995) ("Traditional principles of agency law may bind a nonsignatory to an arbitration agreement." (collecting cases)).

### 1. Dirk Stallman

Dirk Stallman, then-President of Verlo, acted as an agent of a disclosed principal. In Section 2.E. of the franchise agreements, MKD agreed that "the officers, directors, employees, and agents of [Verlo] act only in a representative capacity, not in an individual capacity, and that this Agreement and all business dealings between Franchisee and such

14

individuals as a result of this Agreement are solely between Franchisee and [Verlo]." Stallman signed the franchise agreements as Verlo's President, and the franchise agreements explained that agents acted only in a representative capacity and were not individually bound by the agreements. No evidence suggests that Stallman acted on behalf of an undisclosed or unidentified principal. Accordingly, as an agent for a disclosed principal, Stallman is not personally bound to the contract and cannot be compelled to arbitrate with MKD on an agency theory.

### 2. Marcus Investments

The legal relationship between Marcus Investments and Verlo is not entirely clear. Without citing to evidence, Plaintiffs dispute MKD's proposed fact that "Marcus Investments owns Verlo." *See* Pls.' Resp. to Def.'s Facts ¶ 1. Plaintiffs dispute other proposed facts that suggest Marcus Investments purchased Verlo but offer no alternate explanation of the relationship. *See id.* ¶¶ 3, 15. Accordingly, MKD's proposed facts related to Marcus Investments' purchasing Verlo will be considered undisputed for the purpose of deciding summary judgment. Fed. R. Civ. P. 56(e)(2).

MKD asserts that "these facts"—Greg and David Marcus participating in Verlo's franchise recruitment efforts and Marcus Investments' "financial[] backing" of Verlo— "create a genuine dispute as to whether the Marcus entities may be bound under agency or undisclosed principal theories." ECF No. 35 at 15. Not so. Assuming that Verlo is a subsidiary of Marcus Investments, a parent-subsidiary relationship does not make Marcus Investments a principal, and certainly not an undisclosed or unidentified principal. To the contrary, MKD argues that Marcus Investments' role was transparently promoted—it owned Verlo.

15

MKD asserts that Verlo could have bound Marcus Investments through apparent or implied agency. *Id.* at 14–15. "Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) (citing *Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 565–74 (1982)). "[S]tatements by an agent are insufficient to create apparent authority without also tracing the statements to a principal's manifestations or control." *Id.* First, MKD cannot trace statements to Marcus Investment's manifestation or control. Second, MKD's reliance would not be reasonable, given the express language in the franchise agreements.

It should hardly need to be pointed out that a subsidiary is not automatically an agent of its parent company. "[A] mere parent-subsidiary relationship 'does not create the relation of principal and agent or alter ego between the two.'" *Zurich Am. Ins. Co.*, 417 F.3d at 688 (quoting *Caligiuri v. First Colony Life Ins. Co.*, 742 N.E.2d 750, 756 (Ill. App. 1 Dist. 2000)). "A corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement." *Id.* (citing *Thomson-CSF*, 64 F.3d at 777). If parent corporations were automatically bound to arbitration agreements signed by subsidiaries, that would "dilute[] the safeguards afforded to a nonsignatory by the ordinary principles of contract and agency and fail[] to adequately protect parent companies . . . . Anything short of requiring a *full showing* of some accepted theory under agency or contract law imperils a vast number of parent corporations." *Thomson-CSF*, 64 F.3d at 780 (emphasis in original) (internal quotation marks omitted).

The cases that MKD cites presuppose an agent-principal relationship that cannot be found here. *See* ECF No. 35 at 14–15. MKD has not explained how this parent-subsidiary

16

relationship is actually an agent-principal relationship, nor how this relationship is anything other than a run-of-the-mill investment company owning another company. Marcus Investments cannot be compelled to arbitrate with MKD on an agency theory.

### 3. Marcus Corp.

The legal relationship between Marcus Corp. and Verlo appears even more attenuated. Marcus family members serve as officer or directors of both organizations. However, overlapping officers do not create an agency-principal relationship: "Mutual benefits derived from affiliation . . . [are] insufficient to bind a non-signatory on agency principles to an arbitration agreement signed by an affiliate." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (per curiam) (citing *Thomson-CSF*, 64 F.3d at 780)).

At the Discovery Day, Marcus family members introduced themselves as executives of Marcus Corp. As with Marcus Investments, to the extent MKD asserts Verlo or a Marcus family member bound Marcus Corp. to the franchise agreements as an apparent agent, MKD's reliance would not be reasonable based on the express language of the franchise agreements. Marcus Corp. cannot be compelled to arbitrate with MKD on an agency theory.

### B. Direct Benefits Estoppel

Under Wisconsin law, equitable estoppel requires "(1) action or non-action; (2) on the part of one against whom estoppel is asserted; (3) which induces reasonable reliance thereon by the other, either in action or non-action; (4) which is to the relying party's detriment." *Milas v. Labor Ass'n*, 571 N.W.2d 656, 660 (Wis. 1997). "Wisconsin courts and federal district courts applying Wisconsin law have rejected equitable estoppel claims when the party seeking to apply estoppel could not show specific facts supporting reasonable and detrimental reliance." *Scheurer*, 863 F.3d at 753.

Applied in the arbitration agreement context, a nonsignatory can be compelled to arbitrate if he directly benefitted from the arbitration agreement. Put differently, "[a] nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Zurich Am. Ins. Co.*, 417 F.3d at 688 (citing *Thomson-CSF*, 64 F.3d at 778); *Everett v. Paul Davis Rest., Inc.*, 771 F.3d 380, 383–84 (7th Cir. 2014). "[C]aselaw consistently requires a *direct* benefit *under the contract containing an arbitration clause* before a reluctant party can be forced into arbitration." *Zurich Am. Ins. Co.*, 417 F.3d at 688 (citing *Thomson-CSF*, 64 F.3d at 779)).

For this inquiry, it matters which party is trying to compel arbitration—a signatory or a nonsignatory. *See Henry Techs. Holdings, LLC v. Giordano*, Case No. 14-CV-63-JDP, 2014 WL 3845870, at *4 (W.D. Wis. Aug. 5, 2014) ("[T]he touchstone of this form of estoppel . . . is whether the non-signatory has brought suit against the signatory premised upon the agreement that contains the arbitration clause at issue, thus seeking the agreement's direct benefits." (quotation omitted)); *Thomson-CSF, S.A.*, 64 F.3d at 779 ("[T]he circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."). Here, by contrast, MKD (the signatory) seeks to compel arbitration against nonsignatories who have not sought to enforce the franchise agreements.

*Everett v. Paul Davis Rest., Inc.*, 771 F.3d 380 (7th Cir. 2014) explained direct benefits estoppel in a franchise agreement context. In that case, a franchisee created an LLC to open the franchise. 771 F.3d at 382. His wife later joined ownership of the LLC—they should have gotten permission from the franchisor to transfer ownership, but didn't, and the wife should have signed the franchise agreement, which contained an arbitration clause, but didn't. *Id.*

18

The Everetts' franchise was terminated, and the franchise agreement included a non-compete. *Id.* Mr. Everett transferred his share of the LLC to Ms. Everett, and the LLC opened a competing business. *Id.* at 382–83. The court found that the Everetts could be compelled to arbitrate with the franchisor, even though Ms. Everett didn't technically sign the franchise agreement, because Ms. Everett received direct benefits: "Ms. Everett was not merely exploiting the contractual relationship among [the signatories], but rather the benefit of the contract itself—namely owning and operating a [] franchise." *Id.* at 384. "[T]he Everetts sought to obtain the benefits of the franchise agreement for both Mr. and Ms. Everett, while still being able to avoid some of the obligations by misrepresenting Ms. Everett's ownership and operating interest in [the LLC]." *Id.* at 385.

Stallman, Marcus Investments, and Marcus Corp. can be considered together here. First, no plaintiff sought to enforce the franchise agreement against MKD. Second, MKD points to no actual benefit that Plaintiffs received. MKD argues that this case is like *Everett* because Marcus family members "held themselves out as financial backers of the Verlo brand, promoted their ownership and experience to induce franchisees, and tied their corporate identity and reputation of the Marcus Corporation and Marcus Investments to the success of the Verlo franchise system. . . . Marcus entities directly benefitted from the expansion of the Verlo franchise system and the execution of franchise agreements such as MKD's." ECF No. 35 at 16. Verlo's "expansion" and a benefit from the "execution" of MKD's franchise agreement can be considered, at most, indirect—a benefit from the contracting relationship, but not from the franchise agreement itself. *Everett v. Paul Davis Rest., Inc.*, 771 F.3d 380 at 383–84 ("[A] benefit derived from the exploitation of the contractual relationship of parties to an agreement, but not the agreement itself[,] is indirect.").

19

Third, equitable estoppel under Wisconsin law requires reasonable reliance. MKD asserts that "it relied on those representations in deciding to enter into the franchise agreements." ECF No. 35 at 16. MKD has not explained how its reliance would be reasonable, given the express language of the franchise agreements. Accordingly, Plaintiffs cannot be compelled to arbitrate with MKD on a direct benefits estoppel theory.

## C. Alter-ego

Lastly, MKD proposes that it can compel Marcus Investments and Marcus Corp. to arbitration based on the alter ego theory. ECF No. 35 at 12. The alter ego theory allows a court to pierce the corporate veil to find liability against a parent corporation in addition to the subsidiary. Veil-piercing is the remedy whereby the corporate form is disregarded, or "pierced," and the plaintiff is allowed to proceed against individual shareholders. *Plumbers & Gasfitters Union Loc. No. 75 Health Fund v. S. Shore Plumbing LLC*, No. 24-CV-907-SCD, 2026 WL 822029, at *8 n.5 (E.D. Wis. Mar. 25, 2026). Applied in the arbitration agreement context, "a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'" *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003) (quoting *Thomson-CSF*, 64 F.3d at 777).

"Veil-piercing is an equitable remedy governed by state law." *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). Under Wisconsin law, MKD must show:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;

20

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-op. of Walworth Cnty. v. Olsen*, 419 N.W.2d 211, 218–19 (Wis. 1988). "The absence of any one of these elements prevents piercing the corporate veil." *Id.* at 218. Courts have often conflated these requirements into just two, noting that the corporate veil may be pierced when "(1) there be such unity of interest and ownership that the separate personalities of the corporation and the individual [shareholders] no longer exist; and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Id.* at n.5.

MKD contends that these facts demonstrate that Marcus Investments or Marcus Corp. are alter egos of Verlo, or at least create a genuine dispute of material fact on that issue:

- Representations that Marcus Investments owned Verlo and that the Marcus family backed the brand;
- Shared branding / marketing emphasizing the Marcus entities' role;
- Overlapping leadership and involvement in strategy and recruitment;
- Evidence suggesting shared operations or business alignment;
- Sharing the same physical principal place of business.

ECF No. 35 at 16–17 (citations to the record omitted).

These facts do not create a triable question as to corporate separateness. On the first element of Wisconsin's veil piercing test, control, the facts do not show that Marcus Investments or Marcus Corp. completely dominated Verlo. Wisconsin courts consider corporate formalities and intermingling finances as significant in evaluating this factor. *See Wiebke v. Richardson & Sons, Inc.*, 265 N.W.2d 571, 574 (Wis. 1978) (shareholder used corporate checking account as personal checking account and seldom took wages); *Olen v. Phelps*, 546 N.W.2d 176, 180 (Wis. Ct. App. 1996) (shareholder handled decisions informally,

21

failed to keep minutes of meetings, and used company funds to satisfy personal debts and mortgage payments); *Sprecher v. Weston's Bar, Inc.*, 253 N.W.2d 493, 498, 500 (1977) (shareholders didn't conduct meetings or keep records of meetings, and the business had no substantial assets). Here, no facts support an inference that Marcus Investments or Marcus Corp. failed to maintain corporate formalities, or intermingled finances with Verlo. While Verlo, Marcus Investments, and Marcus Corp. shared overlapping leadership, "100% stock ownership and commonality of directors and officers are not alone sufficient to establish an alter ego relationship between two corporations." *Insolia v. Philip Morris, Inc.*, 31 F. Supp.2d 660 (W.D. Wis. 1998) (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)) (considering alter ego doctrine for personal jurisdiction purposes).

MKD also has not conclusively shown that Marcus Investments and Marcus Corp. used their control to commit a fraud, or wrong, or unjust act. As the Supreme Court of Wisconsin has said, there must be some "injustice" resulting from the control. *Consumer's Co-op.*, 419 N.W.2d at 214. The injustice must stem in some way from the defendant's (mis)use of the corporate form itself. In *Consumer's Co-op*, the Wisconsin Supreme Court approvingly cited a then-recent law review article that explained injustice can occur in two scenarios: "when a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business or when a plaintiff has been misled by the corporate structure of an enterprise." 419 N.W. at 216 n.6 (quoting Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law*, 95 Harv. L. Rev. 853, 855 (1982)).

Here, the evidence does not suggest that Marcus Corp. or Marcus Investments used the corporate form in a way that perpetrated fraud or injustice. Nothing suggests that Verlo

22

was so undercapitalized that it is unable to meet its obligations. MKD asserts that was misled by Verlo's "representations that Marcus Investments owned Verlo and that the Marcus family backed the brand," and the promotional emphasis on the Marcus family and Marcus entities' role. First, these facts do not demonstrate Marcus Investments' or Marcus Corps.' misuse of the corporate form. Second, as discussed in the decision and order dismissing MKD's counterclaims, ECF No. 48 at 9–10, these statements have not been attributed to Marcus Investments or Marcus Corp. Third, MKD hasn't explained why its purported understanding is in any way reasonable—in light of the corporate relationships and the express language in the franchise agreements.

In short, the undisputed facts show that Marcus Investments and Marcus Corp. cannot be compelled to arbitrate with MKD on an alter ego theory. MKD has not come forward with a dispute of material fact that would create a triable question on the alter ego theory.

## CONCLUSION

For all the foregoing reasons, the Plaintiffs' motion for summary judgment against MKD is granted. Plaintiffs are not parties to the franchise agreements; are not subject to the franchise agreements; and cannot be compelled to arbitrate with MKD.

MKD's motion to continue summary judgment briefing pending completion of additional discover, ECF No. 39, is **DENIED**. The Plaintiffs' motion for summary judgment against MKD, ECF No. 27, is **GRANTED**.

23

**SO ORDERED** this 14th day of July, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge

24